January 27, 2021

**Supreme Court**

No. 2019-13-C.A.
(P2/12-140A)

State                           :

    v.                          :

Joseph Segrain.                 :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                      :

v.                                         :

Joseph Segrain.                            :

Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Joseph Segrain, seeks review of an adjudication of a probation violation after a hearing that took place in October of 2017 in light of new charges having been filed against him as the result of a drive-by shooting.  At the conclusion of the hearing, the hearing justice found that the defendant had violated the terms and conditions of his probation, and she proceeded to order him to serve the nine years remaining on a suspended sentence which he had received as a result of an earlier conviction.  The defendant contends on appeal that his being ordered to serve the nine years remaining on his suspended sentence was improperly based solely on the new charges, without due attention being given to the original conviction for which he was on probation.  This case came before the Supreme Court for oral argument pursuant to an order directing

- 1 -

the parties to show cause why the issues raised in this appeal should not be summarily decided. After examining the written and oral submissions of the parties, we are of the opinion that cause has not been shown and that the appeal may be resolved without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On January 10, 2012, defendant pled *nolo contendere* to one count of possession of marijuana with intent to distribute.[1] Following defendant's plea, the trial justice sentenced defendant to ten years of incarceration, with one year to serve and nine years suspended, with probation. The defendant remained on probation on January 9, 2017, when the events at issue in this case transpired; following a shooting incident on that date (described below), defendant was arrested and charged with various crimes. Subsequently, the state filed a notice of

---

[1] The defendant also pled *nolo contendere* to one count of maintaining a common nuisance for the sale of controlled substances and received a three-year suspended sentence on that count. However, the plea as to that count has no relevance to the instant appeal.

probation violation pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, which gave rise to the instant case.[2]

On various dates between October 12 and October 25, 2017, a probation violation hearing was held in the Superior Court. We recount below the salient aspects of the hearing.

**A**

**The Testimony of Dana Smith**

The first witness to testify was Dana Smith, the official in charge of security operations for the Superior Court. Mr. Smith testified that, on January 9, 2017, he was working at the Licht Judicial Complex when he saw two men exit Courtroom 10, followed by Attorney Lauren Balkcom. It is clear from the record that those two men were defendant and one John Laboy.[3] Mr. Smith testified that, after defendant was asked what business the two men had in the courthouse, defendant

---

[2] The instant case deals only with defendant's appeal from his probation violation sentence. The Court at this time is not addressing the charges stemming from the January 9, 2017 events.

[3] According to the uncontradicted testimony adduced at the hearing, there are two gangs that are relevant to the instant case: Bucket East and Bucket West. The defendant and Mr. Laboy are members of the Bucket East gang. Certain of the other witnesses who testified in this matter are also members of the Bucket East gang. On the other hand, Carlos DePina and Nelson Barbosa, who are also referenced in this opinion, are members of the Bucket West gang. The two gangs are rivals.

responded either "'I'm here for my boy'" or "'I'm here for * * * my brother,'" but he provided no further information.

Mr. Smith, who was standing outside the door to Courtroom 10, testified that during this conversation he noticed "four [other] gentlemen sitting in the back of the courtroom" who "were kind of almost ducking * * *." Mr. Smith testified that Mr. Laboy, who had already left the courtroom, "turned toward the guys sitting in the courtroom and made a hand gesture toward his throat." Mr. Smith stated that, at that point, he asked Mr. Laboy to leave the courthouse and that defendant left shortly thereafter. Mr. Smith stated that, upon exiting onto Benefit Street, defendant joined a group of approximately fifteen individuals, including Mr. Laboy, who "went to the left, right to College Hill * * * [and] started walking up the hill."[4] Mr. Smith further stated that the group proceeded to get into two cars parked on College Street; he added that defendant sat in the driver's seat of a blue SUV-style BMW.

Mr. Smith further testified that, after defendant and his companions had left the courthouse, the four men who had been seated in the back row of Courtroom 10 also left the courthouse. Mr. Smith stated that, between three and five minutes

---

[4] The record reflects that Mr. Smith and other witnesses referred to the street on which defendant had parked his vehicle as "College Hill." However, it is clear from Mr. Smith's testimony and the record as a whole that all references to "College Hill" were intended to mean "College Street," which street is located adjacent to the Providence County Superior Court. We shall hereinafter use the term "College Street."

after those four individuals had left, he heard gunshots and immediately proceeded to the area from whence the shots had emanated. He stated that, upon arriving there, he discovered that shots had been fired at a white vehicle; he added that an ambulance had arrived and emergency personnel had already removed the victim from the vehicle.

**B**

**The Testimony of Attorney Lauren Balkcom**

The next witness to testify was Attorney Lauren Balkcom. Attorney Balkcom testified that, on January 9, 2017, she was at the Providence County Superior Court representing Carlos DePina[5] on charges unrelated to the present case. She stated that Carlos was seated next to several companions[6] in the back of Courtroom 10. Those companions included Carlos's cousin, Mathew DePina, and Mathew's brother, Jovan, and his cousin, Nelson Barbosa.[7]

---

[5] We note at the outset that the surname of three individuals to whom we make reference in this opinion is DePina—those individuals are Carlos, Mathew, and Jovan. Mathew and Jovan are brothers; Carlos is their cousin. To avoid confusion, we will refer to each by his first name. In doing so, we intend no disrespect.

[6] It is clear from the record that Carlos's companions were at the courthouse to support him. None of them had a scheduled court date on January 9, 2017.

[7] For purposes of consistency, we will also refer to Nelson by his first name. In doing so, we intend no disrespect.

Attorney Balkcom testified that, after participating in a conference with a trial justice relative to Carlos's case, she spoke with Carlos in the back of the courtroom. She testified that, while she was discussing Carlos's case with him, defendant entered the courtroom and sat in the space between Carlos and his companions. Attorney Balkcom further testified that, after exchanging brief remarks with defendant, she told him: "I can't ask you to leave the courtroom, but I will ask you to please leave my conversation * * *." She noted that, before exiting the courtroom, defendant looked in her and Carlos's general direction and "wav[ed] his hand back and forth across where his neck was." Attorney Balkcom also testified that another individual—who she later learned was Mr. Laboy—made similar hand gestures from outside the courtroom door.

Attorney Balkcom testified that, inside the courtroom, one of Carlos's companions showed her a Facebook Live[8] video on his cellular phone, which depicted a group of people—one of whom she recognized as Mr. Laboy—standing outside the Benefit Street entrance of the courthouse. She noted that, in the video, Mr. Laboy made hand gestures similar to those she had observed him making

---

[8] Facebook Live is a feature of Facebook, an online social networking platform, that allows users to "[g]o live on Facebook to broadcast a conversation, performance, Q&A or virtual event." *See* https://facebook.com/formedia/solutions/facebook-live (last visited January 25, 2021).

earlier; she added that he also said: "F*** you. F*** your Public Defender lawyer. F*** the West. We're going to get you, boy * * *."

Attorney Balkcom next testified that she went to the window of Courtroom 10, from which she saw the same group of individuals getting into two vehicles—one of which was a blue SUV-style BMW. She further stated that she took photographs of both vehicles when they drove down College Street, and she identified defendant as the driver of the BMW. She added that, as she was standing on the first floor preparing to leave the courthouse, she saw Mr. Smith running out of the courthouse onto South Main Street. She stated that she followed Mr. Smith across South Main Street toward the Crawford Street Bridge,[9] where she observed an individual—who she later learned was Mathew—being placed onto a stretcher.

## C

### The Testimony of Mathew DePina

Mathew, the victim of the shooting, also testified at the hearing. Mathew testified that, on January 9, 2017, he picked up Carlos, Jovan, and Nelson and

---

[9] We note that Attorney Balkcom did not indicate the name of the bridge during her testimony, but only described its location. She stated as follows: "I ran across South Main Street and I ran over to where the bridge is. So if you go across South Main Street and there's a big statute [*sic*] right outside, on the other side of the street I went to the left of that over towards that bridge." Based on Attorney Balkcom's detailed narrative, we infer that she was referring to the Crawford Street Bridge.

drove them to the courthouse. Mathew testified that, after he parked the car near the courthouse, the group proceeded to Courtroom 10 to be with Carlos. Mathew stated that they sat in the back row of the courtroom.

Mathew testified that, while he and his companions were seated in the courtroom, defendant entered the courtroom, accompanied by a group of approximately ten individuals, and he sat directly between Nelson and Jovan. Mathew stated that, after Attorney Balkcom asked defendant to leave the area, "he did like a sniffle, a gesture, and after that called [Carlos's] lawyer a public attorney" before exiting the courtroom with the individuals who had accompanied him.

Mathew testified that, while still inside the courtroom, he watched a Facebook Live video on his cellular phone, which video showed "John Laboy and the group of people that [had been] inside the courtroom." In further describing the video, Mathew said: "They was outside the courtroom doing gestures, hand gestures, saying * * * f*** both my cousins, Nelson and Carlos, and everybody from the West."

Mathew testified that, when he returned to his car, he noticed defendant driving a dark-colored SUV-style BMW nearby. Mathew stated that he left his parking spot to pick up his cousins and brother and that, while driving, he noticed that a vehicle was following him. He testified that, as he continued driving, he saw

the BMW pull up alongside his car. Mathew stated that shots were fired and that he was struck by bullets in the back, neck, and shoulder; he added that he continued driving until he crashed his car into a snow bank.

**D**

**The Testimony of Brandon Bates**

Brandon Bates, a member of the Bucket East gang, also testified at the hearing. He stated that, on January 9, 2017, he drove Mr. Laboy to the courthouse because Mr. Laboy had a court date. He added that he parked his car on College Street, a few spaces behind defendant's BMW. Mr. Bates testified that, when he arrived at the courthouse, he observed a number of individuals from the Bucket East gang, including defendant. He stated that, when those individuals later exited the courthouse, they remained on the steps in front of the Benefit Street entrance. He specifically noted that the group was waiting for Carlos to leave because if Carlos "tried something * * * we were going to have to beat him up." Mr. Bates added that they stood outside for twenty to thirty minutes before heading back to their cars. Mr. Bates stated that he and Mr. Laboy got into Mr. Bates's Nissan Altima and that he saw defendant get into the driver's seat of the BMW.

Mr. Bates testified that, while waiting for Carlos to leave the courthouse, he parked his car near Mathew's car, which Mr. Bates called a "Chevy," and drove around in another gang member's car before returning to his own vehicle so as to

leave the area. He noted that, when he arrived back at his car, the Chevy started pulling out of its parking spot. Mr. Bates then stated that he followed the Chevy and, shortly thereafter, defendant pulled his BMW up alongside the Chevy and opened fire.

### E

### The Testimony of Samuel[10]

Sixteen-year-old Samuel testified at the hearing that, on January 9, 2017, he was in Providence riding in a black BMW which was following a white Chevy. Samuel stated that he saw defendant shoot into the white Chevy. He testified that defendant then sped away from the scene.

### F

### The Hearing Justice's Decision

In her bench decision at the close of the hearing, the hearing justice set forth her factual findings. The hearing justice based her findings of fact on what she deemed to be the credible testimony of a number of witnesses,[11] as well as several still photographs and videos that were entered into evidence as full exhibits.

---

[10]    We refer to the witness pseudonymously.

[11]    Although other witnesses also testified, the hearing justice specifically referred to the testimony of Dana Smith, Attorney Balkcom, Mathew DePina, Brandon Bates, and Samuel, as well as three additional witnesses—Geovanni Perez, Neil Clapperton, and Nathan Tek—whose testimonies we need not recount for the purposes of this appeal.

Taking into account her factual findings and the evidence she deemed credible, the hearing justice found that, on January 9, 2017, defendant acted in a "hostile and aggressive manner" in Courtroom 10 due to his hostility toward Carlos, a member of a rival gang. She found that, despite being asked to leave the area by security officers, defendant and his fellow gang members "remained in the area in an effort to have a violent confrontation with Carlos DePina when he left the courthouse * * *." The hearing justice further found that neither Carlos nor his companions were interested in engaging in a confrontation with defendant or the members of his gang; she found that, in fact, they demonstrated a strong desire to avoid a confrontation. She found that defendant was the driver of the BMW and that he discharged a firearm at the Chevy, causing Mathew to suffer serious injuries. In view of these findings, the hearing justice ultimately declared defendant a probation violator.

After hearing brief argument from counsel with respect to sentencing, the hearing justice, in making her decision, focused on both the underlying 2012 conviction for possession of marijuana with intent to distribute, as well as the more recent conduct that triggered the Rule 32(f) violation hearing. She further stated that, in reaching a sentencing decision, a hearing justice "must consider the possibilities for [d]efendant's rehabilitation, deterrence to others[,] and appropriateness of the punishment for the crime committed." The hearing justice

- 11 -

recognized the fact that defendant had not been convicted of any crimes since his 2012 conviction and that he had children at home. She nonetheless stated that "[t]he severity of the new conduct is such that I feel the need to revoke his remaining probation * * *." Consequently, after noting that the 2012 sentence was "a pretty generous one," the hearing justice ordered defendant to serve the nine years remaining on his previously imposed suspended sentence.

A judgment entered[12] sentencing defendant to the nine years remaining on his suspended sentence. The defendant timely filed a notice of appeal.

## II

### Standard of Review

It is well established that it is the duty of the court at a probation violation hearing to determine "whether or not the defendant has breached a condition of his or her probation by failing to keep the peace or remain on good behavior." *State v. Ditren*, 126 A.3d 414, 418 (R.I. 2015) (internal quotations marks omitted); *see State v. Fairweather*, 138 A.3d 822, 826 (R.I. 2016). Pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure, as amended in 2016,[13] the state must

---

[12] No judgment is contained in the physical record transmitted to this Court, nor is one available in the electronic filing system. However, the docket reflects a judgment of conviction on October 25, 2017, and defendant has attached an undated and unsigned copy of the judgment to his Rule 12A statement.

[13] We are cognizant of the fact that "a 2016 amendment to Rule 32(f) of the Superior Court Rules of Criminal Procedure increased the state's burden of proof

establish "by a *fair preponderance of the evidence* that the defendant breached a condition of the defendant's probation or deferred sentence or failed to keep the peace or remain on good behavior." *State v. D'Amico*, 200 A.3d 1068, 1071-72 (R.I. 2019) (emphasis added) (internal quotation marks omitted); *see also* Super. R. Crim. P. 32(f).

We have stated that, "[i]n making this determination, the hearing justice weighs the evidence and assesses the credibility of the witnesses." *State v. Prout*, 116 A.3d 196, 202 (R.I. 2015) (internal quotation marks omitted). We have further stated that deference should be accorded "to the assessment of the credibility of witnesses made by a judicial officer who has had the opportunity to listen to live testimony and to observe demeanor." *State v. Washington*, 42 A.3d 1265, 1271 (R.I. 2012) (internal quotation marks omitted). This Court's review is "limited to considering whether the hearing justice acted arbitrarily or capriciously in finding a violation." *State v. Beaudoin*, 137 A.3d 726, 732 (R.I. 2016) (internal quotation marks omitted); *see Prout*, 116 A.3d at 202.

---

such that it must now establish by a fair preponderance of the evidence that the defendant breached a condition of the defendant's probation or deferred sentence or failed to keep the peace or remain on good behavior." *State v. D'Amico*, 200 A.3d 1068, 1071-72 (R.I. 2019) (internal quotation marks omitted).

**Analysis**

The defendant contends that the hearing justice erred in sentencing him to serve the full nine years of a previously suspended sentence. In particular, defendant points out that, in his view, after brief statements about defendant's background and character, the hearing justice "strayed in her analysis of formulating an appropriate sentence by focusing solely on the charges that had been alleged as a basis for the violation of probation." The defendant further contends that the hearing justice did not know the facts of the underlying case prior to sentencing.

It is well established that "the unexecuted portion of a probationer's suspended sentence hangs over his or her head by the single horsehair of good behavior, until such time as the term of probation expires." *State v. Parson*, 844 A.2d 178, 180 (R.I. 2004); *see State v. McKinnon-Conneally*, 101 A.3d 875, 879 (R.I. 2014). When a defendant severs that single horsehair by violating the terms and conditions of his or her probation, the hearing justice has "wide discretion to determine whether to execute *any or all* of a defendant's previously suspended sentence." *McKinnon-Conneally*, 101 A.3d at 879 (emphasis added); *see Neufville v. State*, 172 A.3d 161, 165 (R.I. 2017). It is also well established that although a hearing justice must focus primarily on the nature of the first offense, he or she

may also consider the circumstances of the second offense. *McKinnon-Conneally*, 101 A.3d at 879; *see Neufville*, 172 A.3d at 166.

In our view, the hearing justice did not abuse her discretion by taking into account the severity of defendant's new conduct in sentencing defendant to the nine years remaining on his previously suspended sentence. *See State v. Simpson*, 174 A.3d 1238, 1243-44 (R.I. 2018); *Neufville*, 172 A.3d at 165-66; *State v. Shepard*, 33 A.3d 158, 166 (R.I. 2011); *State v. Wisehart*, 569 A.2d 434, 437-38 (R.I. 1990). We recognize that the hearing justice gave great weight to the gravity of the charges precipitating the probation violation hearing, stating that "this particular conduct while on probation would tend to suggest that [defendant] is not a good candidate for rehabilitation." We have found that consideration of the severity of a defendant's more recent wrongdoing as it relates to his or her ability to be rehabilitated is a factor that may be appropriately considered in making a sentencing determination. *See Simpson*, 174 A.3d at 1244; *Shepard*, 33 A.3d at 166; *Wisehart*, 569 A.2d at 438.

We also are not persuaded by defendant's contention that the instant case is directly comparable to our decision in *State v. Fortes*, 114 R.I. 161, 330 A.2d 404 (1975). In that case, the defendant had pled *nolo contendere* and received a deferred sentence for possession of marijuana. *Fortes*, 114 R.I. at 162, 330 A.2d at 406. After finding that defendant had violated the terms of his deferred sentence

by committing assault with intent to murder, the hearing justice entered judgment against the defendant, sentencing him to fifteen years at the Adult Correctional Institutions. *Id.* at 163, 330 A.2d at 406. After reviewing the record in that case, this Court concluded that the sentence was "excessive" and was "unduly influenced by the seriousness of the offense which precipitated the revocation hearing and the resulting grievous injuries to the victim of that offense." *Id.* at 173-74, 176, 330 A.2d at 411, 412.

We do not believe that the instant case is genuinely comparable to *Fortes*. First, in the case now before this Court, the offense underlying defendant's probationary sentence is possession of marijuana *with intent to distribute*—an offense for which a sentence of up to thirty years is available under the statute.[14] Second, and perhaps more importantly, the hearing justice clearly stated that she based her sentencing decision on *several* factors, namely: the seriousness of the 2012 conviction; the gravity of the more recent conduct; the possibility of rehabilitation; and other traditional sentencing factors. We are persuaded that the hearing justice in the instant case considered several appropriate factors in making

---

[14] The defendant was charged and pled *nolo contendere* to possession of marijuana with intent to distribute under G.L. 1956 § 21-28-4.01(a)(4)(i). That section reads as follows: "Any person, except as provided for in subdivision (2) of this subsection, who violates this subsection with respect to: (i) A controlled substance, classified in schedule I or II, is guilty of a crime and, upon conviction, *may be imprisoned for not more than thirty (30) years*, or fined not more than one hundred thousand dollars ($100,000) nor less than three thousand dollars ($3,000), or both * * *." Section 21-28-4.01(a)(4)(i) (emphasis added).

her sentencing decision and that she did not rely *solely* on the new charges pending against defendant.

Accordingly, we are of the opinion that, by executing the full nine years of the defendant's original suspended sentence, the hearing justice acted well within her discretion.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

Justice Lynch Prata and Justice Long did not participate.

Justice Flaherty participated in the decision but retired prior to its publication.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Joseph Segrain. |
| **Case Number** | No. 2019-13-C.A. (P2/12-140A) |
| **Date Opinion Filed** | January 27, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State: <br><br> Owen Murphy <br> Department of Attorney General <br><br> For Defendant: <br><br> Christopher S. Gontarz, Esq. |